IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2010

## STATE OF TENNESSEE v. DONNIE LEE SULLIVAN

**Direct Appeal from the Circuit Court for Marshall County**
**No. 09CR45      Robert Crigler, Judge**

---

**No. M2010-01094-CCA-R3-CD - Filed August 3, 2011**

---

The defendant, Donnie Lee Sullivan, stands convicted of voluntary manslaughter, a Class C felony. The trial court sentenced him as a Range I, standard offender to four years and nine months in the Tennessee Department of Correction. On appeal, the defendant challenges the sufficiency of the evidence, the sentence length, and the denial of alternate sentencing. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and DAVID H. WELLES, Sp. J., joined.

Gregory D. Smith (on appeal), Clarksville, Tennessee, and William J. Harold (at trial) for the appellant, Donnie Lee Sullivan.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

On April 22, 2009, a Marshall County grand jury indicted the defendant, Donnie Lee Sullivan, for the voluntary manslaughter of Timothy Swaw, a Class C felony. A jury trial was held in January 2010.

Wanda Sullivan testified that she was married to the defendant. They first married in 1991 and divorced the same year. They re-married in 1992. At the time of trial, she had

filed for divorce. Mrs. Sullivan testified that the defendant was fifty-two years old, and she was sixty-one. She had four children from a previous marriage, including the victim, Timothy Swaw. She said that the victim was forty-one years old at the time of his death. Mrs. Sullivan testified that the defendant was six feet, three inches tall and weighed approximately 250 pounds. She said that the victim was over six feet tall and weighed 285 pounds. She and the defendant lived together in Cornersville, Tennessee, until the victim's death on February 15, 2009. Her grandson and the victim's nephew, Brandon Swaw, had lived with them for three to four months prior to February 2009. Mrs. Sullivan said that Brandon[1] was twenty-two years old. She testified that Brandon and the defendant had been having problems with each other. Mrs. Sullivan testified that in February 2009 she had health problems, including multiple sclerosis and emphysema, and she used an oxygen tank. Mrs. Sullivan said that there were approximately six unloaded guns in a rack on the wall of her living room. There were more guns in a locked gun cabinet in the defendant's bedroom. She said that the guns in the gun cabinet were loaded and that there was ammunition in the cabinet. The defendant kept the key to the gun cabinet on top of the cabinet.

Mrs. Sullivan testified that on February 14, 2009, the victim treated the family to dinner at Shoney's Restaurant. Brandon and the defendant had an argument at the restaurant, and the defendant said that "he was going to lock the house down." She said that the defendant was angry with her for taking Brandon's side. On February 15, 2009, she made breakfast and washed the breakfast dishes. She was not feeling well and was breathing very hard, so she laid down on the living room couch. The victim, his wife, and his three-year-old daughter came over to the Sullivans' house at 1:00 p.m. The victim, Brandon, and the defendant were outside watching the three-year-old ride an electric four-wheeler, and the victim's wife, Tracy Swaw, came inside to talk to Mrs. Sullivan. Mrs. Sullivan told Mrs. Swaw that she needed to go to a doctor. Mrs. Swaw went outside and returned accompanied by the rest of the family. Mrs. Sullivan testified that Brandon told the defendant that the defendant should take Mrs. Sullivan to the hospital. The defendant responded that he was going to take her to the doctor on Tuesday and would wait until then. She said that the defendant shoved Brandon, who fell onto the couch. The victim told the defendant "to pick on somebody his own size." Mrs. Sullivan testified that the defendant shoved the victim against a buffet. The victim put the defendant into a headlock on the floor and did not let him up until he promised to be calm. Mrs. Sullivan explained that the defendant tried to get free of the headlock, and the victim had to "get another grip on him." She said that when the victim let the defendant go, the defendant was bleeding because he had hit his mouth on a dog bowl. Mrs. Sullivan told the defendant to go wipe the blood off. The defendant left the room, saying that he was going to the bathroom. The victim went outside. Mrs. Sullivan testified that she heard a gun cock. She told the victim as he was walking back inside that

---

[1] Because Brandon Swaw and the victim, Timothy Swaw, share the same last name, we will refer to Brandon Swaw by his first name throughout the opinion to avoid confusion. No disrespect is intended.

the defendant had a gun. She said that the victim grabbed a gun by the barrel from the wall rack and said, "You are not going to kill my family." Mrs. Sullivan testified that the gun that the victim took was an unloaded .22 caliber rifle with a plastic stock. She said that the victim and the defendant would both have known that the rifle was unloaded because she had insisted that the guns on the wall remain unloaded for her grandchildrens' sakes. Mrs. Sullivan said that the victim was holding the rifle by the barrel with both hands, "like a baseball bat." She testified that she was standing by the victim as he walked towards the defendant's bedroom door. She explained that the defendant's bedroom was approximately ten steps away from the living room. She said that the bedroom was dark, and one could not see inside of the room. Mrs. Sullivan testified that the victim did not cross the threshold into the bedroom, and he never changed the position of his hands on the rifle. She said that the victim stopped, and she heard a gun fire. She said that the gunshot sounded muffled. The victim dropped the rifle, and he said, "I didn't believe he would ever shoot me." She said that she could see a wound on his side. He walked through the living room, went outside, and laid down on the tailgate of his truck. Mrs. Sullivan and Mrs. Swaw followed the victim outside. The victim was bleeding and having difficulty breathing. Mrs. Sullivan testified that the defendant came outside holding a shotgun and said, "You ain't going to beat me in my house any more [sic], you son of a bitch." Mrs. Sullivan said that the defendant "was carried away from the house" and an ambulance came for the victim. She testified that the victim died that day.

On cross-examination, Mrs. Sullivan testified that the defendant used a cane and had back problems.

On re-direct examination, Mrs. Sullivan said that the defendant did not always use a cane to walk and that he was not using a cane on February 15. She testified that she "ended up in the hospital with pneumonia" after that day.

Tracy Swaw testified that she had been married to the victim for eleven years prior to his death, and they had a daughter, who was three years old as of February 2009. Mrs. Swaw testified that her husband treated his family, his mother (Mrs. Sullivan), his stepfather (the defendant), and his nephew (Brandon Swaw) to dinner at Shoney's Restaurant on February 14, 2009. Mrs. Swaw said that the defendant and Brandon had an argument over cigarettes. The following day, Mrs. Swaw and their daughter accompanied the victim to Cornersville, Tennessee, to visit Mrs. Sullivan and to let their daughter ride her electric four-wheeler. Mrs. Swaw said that she wanted to check on Mrs. Sullivan because she was concerned about her health. She testified that Mrs. Sullivan had a rattle in her chest. Mrs. Swaw testified that the victim and Brandon stayed outside watching their daughter ride her four-wheeler while she went inside to talk to Mrs. Sullivan. Mrs. Sullivan was on the couch in the living room, and the defendant was sitting in the recliner. Mrs. Swaw urged Mrs. Sullivan to go to a doctor. Mrs. Swaw said that the defendant told her, "I am not taking her

to the doctor because she took up for Brandon." He also said that he would take her to a doctor on Tuesday. Mrs. Swaw went outside to talk to the victim. She said that he and Brandon continued to watch their daughter ride for a few minutes, and then they loaded the four-wheeler into the victim's truck. She, the victim, and Brandon went inside.

Mrs. Swaw testified that she and the victim sat down on the love seat, and their daughter sat in the victim's lap. Mrs. Sullivan was lying down on the couch, and Brandon sat on the couch at her feet. Mrs. Swaw testified that the victim told Mrs. Sullivan and the defendant that Mrs. Sullivan needed to see a doctor. She said that they wanted to take her to the emergency room because it was a Sunday. The defendant repeated that he was not going to take her to the doctor because she had taken up for Brandon, and the victim responded that he would drive his mother to the hospital. Mrs. Swaw testified that the defendant said that Mrs. Sullivan just needed a "mucus pill," which he retrieved for her. Mrs. Swaw said that Mrs. Sullivan took the pill, but she did not improve. Brandon continued trying to persuade Mrs. Sullivan to see a doctor.

Mrs. Swaw testified that the defendant and Brandon both stood up, and the defendant shoved Brandon back down onto the couch. Mrs. Swaw said that Brandon had gotten up to help Mrs. Sullivan and that the defendant was not using a cane that day. She testified that the victim said, "Donnie, leave him alone. Pick on somebody your own size." Mrs. Swaw said that the defendant walked over to the victim, who was still seated, and began yelling at him and pointing his finger in the victim's face. Mrs. Swaw testified that the defendant said, "This is my GD house; I will do whatever I want to." The victim stood up and placed his daughter down on the love seat. Mrs. Swaw said that the victim and the defendant were standing six inches apart, and the defendant continued screaming at the victim. She said that the defendant was slightly taller than the victim. Mrs. Swaw testified that the defendant shoved the victim, the victim shoved the defendant back, and the defendant shoved the victim a second time. The second time, the victim fell back into a buffet. She said that the victim got the defendant into a headlock, and they went down to the ground. She heard the defendant tell the victim that he was hurting his back and to let him up. The victim responded that he would let the defendant up if he would calm down. The defendant promised to calm down, so the victim let him go. Mrs. Swaw said that the defendant began yelling at the victim and shoved him again. The victim put the defendant in another headlock. Mrs. Swaw testified that she did not see the victim hit the defendant in the mouth either the first time he put the defendant in a headlock or the second time. She said that the defendant hit his lip on a dog bowl, and she noticed that his lip was bleeding slightly. The victim let the defendant go again once the defendant promised to calm down. Mrs. Swaw said that the victim went outside, and the defendant said that he was going to wash his mouth off in the bathroom. She testified that the defendant shoved her out of his way as he left the living room.

Mrs. Swaw said that the victim came back inside after approximately five minutes. She testified that the victim's habit, when he "lost his temper" was to "leave the room and come back and apologize." After the victim came back inside, she said that she heard "[a] shotgun being racked." She testified that the sound came from the defendant's bedroom. Mrs. Swaw said that Mrs. Sullivan shouted that the defendant had a gun, and the victim grabbed a .22 caliber rifle by its barrel from the living room's wall rack. Mrs. Swaw did not know whether the rifle was loaded or not. She said that the victim was holding the rifle like a baseball bat, with the stock over his shoulder. She said that the victim did not say anything, but he walked towards the defendant's bedroom. She could not see whether the victim went inside the bedroom or not. Mrs. Swaw testified that she heard a gunshot, which she described as a soft sound. She said, "[The victim] came out of the room holding his side and said, [']I can't believe he shot me.[']" The victim went outside, pulled down his truck's tailgate, and laid across it. She followed him outside and called 911.

Mrs. Swaw said that the defendant came outside, with a gun in his hands. She told him that he would go to jail, and he replied, "No, I won't; this is my GD house; I won't go to jail." Mrs. Swaw testified that the police and ambulance arrived. She followed the ambulance when they took the victim away. Mrs. Swaw testified that they transported the victim to the Vanderbilt University Medical Center ("Vanderbilt"), in Nashville, Tennessee, by helicopter. He passed away approximately twenty minutes after arriving at Vanderbilt.

On cross-examination, Mrs. Swaw agreed that she told the police in her February 17, 2009, statement that the victim shoved the defendant first, but she explained that she "was still in shock" when she gave the statement. She further agreed that she told the police that the victim asked the defendant if he was going to shoot him. Mrs. Swaw said that when the defendant came outside with the gun, the 911 dispatcher told her to get him to put the gun down. The defendant went back inside and returned without the gun. The defendant's sister arrived and told the defendant to get a towel to try stop the victim's bleeding, which he did.

On re-direct examination, Mrs. Swaw testified that she gave a statement to a Tennessee Bureau of Investigation agent on March 18, 2009, in which she stated that the defendant shoved the victim first.

Brandon Swaw testified that he was the victim's nephew and Mrs. Sullivan's grandson. He said that he moved into the defendant and Mrs. Sullivan's house in mid-December, 2008. Brandon said that he and the defendant began having problems in January because he did not like the way that the defendant talked to Mrs. Sullivan. He testified that when the family went to Shoney's Restaurant on February 14, 2009, he and the defendant had an argument about his wanting to go outside to smoke. Brandon said that Mrs. Sullivan took his side. After he, the defendant, and Mrs. Sullivan returned home, Brandon called his father to talk to him about the situation in the defendant's home. While he was on the phone,

the defendant told him that he should not be talking to other people about what happened in the house and that "he was going to put the house on lockdown." He said that Mrs. Sullivan told the defendant "to let it be." Twenty to thirty minutes after speaking with his father, Brandon called the victim and asked the victim to come to pick him up. The victim said that he would not pick him up that night, but he would see him the next day. The victim also told him to go to bed and let things calm down.

Brandon further testified that the victim, Tracy Swaw, and their daughter came over to the defendant's house the following day. He and the victim went outside to watch the Swaws' daughter play on her four-wheeler while Mrs. Swaw went inside. He said that ten to fifteen minutes later, Mrs. Swaw came outside to tell them that Mrs. Sullivan was in bad condition and needed to go to the hospital. They stayed outside for five more minutes to get the Swaws' daughter off of the four-wheeler and put the four-wheeler away. When they went inside, he sat at Mrs. Sullivan's feet on the couch while the victim and Mrs. Swaw sat on the loveseat with their daughter. Brandon testified that they all told Mrs. Sullivan to go to the hospital, but the defendant said that he would not take her. He said that he stood up to help Mrs. Sullivan off of the couch, and the defendant pushed him back down onto the couch. Brandon testified that the victim told the defendant, "You don't need to be pushing on him. If you are going to push on somebody, you need to have somebody your own size." Brandon said that the defendant began yelling at the victim. The victim stood up after setting his daughter, who had been sitting in his lap, to the side, and began yelling back at the defendant. The defendant shoved the victim, and the victim put the defendant into a headlock. Brandon testified that the defendant "got loose" and shoved the victim into a buffet. He said that the victim put the defendant into another headlock, and they fell to the floor. The defendant said that he would calm down and that his back was hurting, so the victim let him go. The defendant "went to go after him again," and the victim put him into a headlock again. Brandon said that the defendant hit his mouth on the dog bowl at that point. When the victim let him go, the victim went outside, and the defendant said that he was going to the bathroom to wash the blood off of his face. Brandon testified that the defendant nudged him out of the way and pushed Mrs. Swaw as he left the living room. Brandon said that he "heard a gun rack" in the defendant's bedroom. Mrs. Sullivan yelled that the defendant had a gun. Brandon testified that the victim came inside and grabbed a rifle from the wall rack and held it "[b]y the barrel, kind of like a bat." The victim said, "I am not going to let you hurt my family." The victim walked towards the defendant's bedroom and stopped in the hallway outside. Brandon said that he could hear someone speak, but he did not know what was said. He could see the victim's back, and he said that he knew that the victim did not go into the bedroom. Brandon testified that he heard a gunshot and went to a neighbor's house to call the police. When he left the neighbor's house, the victim was lying in the bed of his truck. Brandon said that he took off his shirt to wrap it around the victim's stomach to try to stop the bleeding. He testified that the

defendant came outside holding a gun and yelling. Brandon said that the ambulance arrived for the victim and eventually took the victim away.

Lisa Adams testified that she and her husband, Stacey Adams, lived across the street from the defendant. She said that on February 15, 2009, her husband came inside and told her that he thought someone had been stabbed across the street. Mrs. Adams went outside and saw the victim stumbling around the yard and bleeding. The victim sat down on a truck's tailgate, and the defendant came outside holding a gun. Mrs. Adams said that there was blood coming from the defendant's nose and that he had blood under his eye and down his cheek. She recalled that the defendant said that the victim was not going to beat him in his house again and that he had shot him.

Stacey Adams testified that he was inside of his house, across the street from the Sullivans' house, when he heard a pop. He looked outside two to three minutes later and saw the victim lying on the tailgate of a truck, bleeding from his side. Mr. Adams told his wife that someone had been stabbed, but then he saw that the victim had been shot. He called 911 and went outside. He said that a crowd had gathered around the Sullivans' house. Mr. Adams testified that the defendant came outside holding a shotgun and said that the victim would not beat him in his house again. Mr. Adams said that the defendant was also "holding his lip up" and said "this is why I shot him."

Tennessee Highway Patrol Trooper David Hill testified that he responded to the shooting because he heard on the radio that the Marshall County units had an extended time of arrival before they could arrive at the scene. He also heard on the radio that the suspect was in a white car at the end of the street where the shooting had taken place. He saw the white car at the corner of Main Street and Beechwood Avenue and asked a woman who was standing there if she knew where the shooter was. She indicated that he was in the car. Trooper Hill took the defendant into custody. He recalled that the defendant was distraught and had a "busted lip."

Marshall County Sheriff's Deputy Cecil Thrasher testified that when he arrived at the scene, the ambulance had transported the victim to a school. He explained that the medical evacuation helicopter would land at the school to take the victim to Vanderbilt. Deputy Thrasher went to the school to get a dying declaration from the victim, but the victim was not able to communicate. He said that the victim was making sounds but was incoherent.

Dr. Adele Lewis, a forensic pathologist, testified that she performed the victim's autopsy on February 16, 2009. She testified that the victim died as a result of blood loss from a distant range shotgun wound to his right torso.

Detective Bob Johnson, of the Marshall County Sheriff's Office, testified that he lived one-quarter mile from the crime scene and responded to the scene after a neighbor called him. He said that he arrived within one minute of the other law enforcement units and took over the investigation. Detective Johnson collected a sixteen-gauge pump shotgun, which was the murder weapon, and a .22 caliber rifle from the Sullivans' residence. At that time, both weapons were unloaded. He testified that there were fourteen other weapons in the house, all of which were unloaded except for one handgun. Detective Johnson said that he spoke with the defendant approximately one and a half hours after the shooting. When he saw the defendant, the defendant "had a busted lip." He stated that the injury was small and did not need stitches. Detective Johnson said that he took a photograph of the defendant's injury, which the state showed to the jury.

Detective Johnson further testified that the defendant gave a written statement after waiving his *Miranda* rights. He read the defendant's statement into evidence as follows:

> I was at home with my wife[,] Wanda Sullivan, and her grandson Brandon Swaw. Tim Swaw came over to the house, and Tim is Wanda's son and my stepson. Wanda was sick. Brandon told Wanda to get up so they could go to the hospital. I told Brandon to be quiet and leave her alone. Tim was sitting on the sofa. Tim got up and said something smart, and then he grabbed me and knocked me into the buffet table. He had me in a headlock and was hitting me in the face. He took me to the ground, and I said, ["]You are choking me.["] he let me go, and I said, ["]My brother will take this up with you.["] He got me in a headlock again and was choking me. He finally let me go, and I went to my room. I unlocked the gun cabinet and got a shotgun. I put a shell in it. I was sitting on my bed, and he came into the room. He was holding a gun, and I shot him. Tim went outside after I shot him, and I went outside with an empty gun and told him and his wife to leave. I went back into the house and put the gun in my room. My sister pulled up, and she told me that we need a towel to stop the bleeding. I went into the house and got a towel and gave it to my sister. I got into the car and went to the corner of the street so the ambulance would come down. The state trooper got there. I got out of the car and done [sic] what they said. The whole time, Tim's wife[,] Tracy Swaw, was there when this happened.

Following the close of proof and deliberations, the jury found the defendant guilty as charged of voluntary manslaughter, a Class C felony. The trial court held a sentencing hearing on March 3, 2010. The court received the defendant's presentence report into evidence and heard testimony.

Chris Hill, a probation officer, testified that he prepared the defendant's presentence report. Mr. Hill said that the defendant added to his statement that he did not know whether the victim's gun was loaded and that he did not intend to kill the victim. The defendant also added that he was "very sorry this happened." The defendant reported to Mr. Hill that he had two foot surgeries and three back surgeries, among other medical procedures. Mr. Hill testified that the defendant reported that he used alcohol and had used marijuana. Mr. Hill said that medical professionals had diagnosed the defendant with antisocial personality disorder.

Wolfgang Wick, a therapist at Centerstone, testified that he diagnosed the defendant with antisocial personality disorder. He treated the defendant four times in 2009, but the defendant was "noncompliant" because he missed several appointments.

Roger Fagan, the former chief of police for the Cornersville Police Department, testified that on May 18, 2005, he responded to a situation that resulted in an assault warrant being issued against the defendant, which was eventually dismissed. Mr. Fagan testified that the defendant did not like for his neighbor's children to play in the street, and the children's mother reported that the defendant made threats to her children and their father. Mr. Fagan said that he calmed the defendant down, but once he left, the defendant "got into it with the neighbors again."

Sabrina Patterson, the jail administrator for the Marshall County Sheriff's Office, testified that she heard the defendant say that "he was going to get even" with people who testified against him at his trial. She said that he made the statement while in the booking area at the jail after the jury convicted him.

Larry Spivey, a transport officer for the Marshall County Sheriff's Office, testified that after the defendant's trial, he saw the defendant in the booking area at the jail. He testified that the defendant "got up and walked toward [him] . . . and told [him] that [the witnesses] lied on him [sic] . . . ; that he was going to get even with them; he was going to take care of each one of them."

Gail Johnson, the defendant's sister, testified that the defendant was living with her and that he could continue to live with her. She said that she was at the Sullivans' house after the shooting, and she drove the defendant away so that the ambulance would come to help the victim.

The trial court found that enhancement factor one - prior criminal behavior - applied because of the defendant's alcohol use as a minor, his use of marijuana, and the dismissed assault charge, but the court placed little weight on the factor. The court also applied enhancement factor nine - use of a firearm. The court considered the three mitigating factors

argued by defense counsel and found that mitigating factor eleven - the defendant committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated the criminal conduct - "most closely describe[d] the situation." The court stated, "I don't think the defendant should have the benefit of all three of those mitigating factors." The court rejected the other two mitigating factors because the court thought that "if the defendant [had not] racked the shotgun when he went back in his bedroom, we probably would not be here." The court denied alternative sentencing, finding that incarceration was necessary to avoid depreciating the seriousness of the offense, that the defendant had a lack of remorse based on his threats after the verdict, and that the defendant was not amenable to rehabilitation because of his diagnosis as having antisocial personality disorder and his noncompliance with treatment at Centerstone. The trial court sentenced the defendant as a Range I, standard offender to four years and nine months in the Tennessee Department of Correction.

**Analysis**

I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his conviction. Specifically, he contends that the proof of self-defense "clearly exist[ed]," rendering the evidence supporting the voluntary manslaughter conviction insufficient. The state responds that the jury decided the issue of self-defense against the defendant and that the evidence was sufficient to sustain the voluntary manslaughter conviction.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); see Tenn. R. App. P. 13(e). In contrast, the jury's verdict, approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006).

Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). An intentional act occurs "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts with a "knowing" mental state "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). The determination of whether "adequate provocation" for an offense exists is a question left to the jury as the trier of fact. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The claim of self-defense is essentially a fact question for the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Viewed in the light most favorable to the state, the evidence at trial showed that the defendant and the victim, who were stepfather and stepson, struggled before the victim went outside and the defendant went to his bedroom. The defendant loaded and racked a shotgun. The victim took an unloaded rifle from the wall and held it like a baseball bat, by the barrel, as he approached the defendant's bedroom. The defendant shot him in the torso, and the victim died of his injury. The jury instructions are not included in the record on appeal, but the parties appear to agree that the jury was instructed as to self-defense. The claim of self-defense is a factual issue, resolved by the jury against the defendant in this case. The jury discredited the defendant's claim of self-defense, and we will not re-evaluate the evidence. We conclude that evidence was sufficient to support the defendant's conviction because the defendant fired a shotgun at the victim after they fought. Therefore, the defendant is without relief as to this issue.

## II. Sentencing

The defendant argues that the trial court erred in determining the defendant's sentence length and in denying alternative sentencing. Specifically, the defendant claims that the trial court "worked off of several incorrect presumptions," including (1) that self-defense is not applicable in a voluntary manslaughter case; (2) that the defendant should only benefit from one mitigating factor; and (3) that incarceration was an effective deterrent to voluntary manslaughter.

## A. Standard of Review

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that

the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

## B. Sentence Length

Pursuant to the 2005 revisions to the sentencing statutes, a trial court has broad discretion in determining the length of a defendant's sentence as long as the sentence imposed is within the applicable range of punishment and the trial court follows the sentencing act. Carter, 254 S.W.3d at 345. In order to facilitate appellate review, the trial court must set forth on the record which enhancement and mitigation factors it considered and the reasons for the sentence. *See id.* at 343. The 2005 revisions "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *Id.* at 344. A defendant may appeal based on grounds that the sentence is excessive under the sentencing considerations set out in Tennessee Code Annotated sections 40-35-103 and 40-35-210 or that the sentence is inconsistent with the purposes of the sentencing act set forth in sections 40-35-102 and -103. *Id.*; Tenn. Code Ann. § 40-35-210(b)(2). This court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346. The presumption that the trial court's determinations are correct fails if the record does not support the trial court's findings, if the trial court applied inappropriate enhancement or mitigation factors, or if the trial court did not follow the sentencing act. *Id.* at 344-45.

In this case, the defendant, as a Range I, standard offender, was subject to a sentence of three to six years for a Class C felony conviction. *See* Tenn. Code Ann. § 40-35-112. The trial court applied two enhancement factors and one mitigating factor. The defendant argues that the trial court "tacitly found" all three factors; however, in our view, the trial court explicitly rejected the other two mitigating factors that the defense counsel argued should apply. Additionally, the defendant's argument that the trial court found that self-defense did not apply to voluntary manslaughter is simply a misrepresentation of what the trial court stated during the sentencing hearing when the court explained that the jury rejected the theory of self-defense. In any event, the defendant's claim on that point is misplaced in a sentencing argument. There is no evidence on the record that the trial court failed to follow the statutory sentencing procedure or give due consideration to the factors and principles relevant to sentencing. Therefore, we affirm the length of the defendant's sentence.

## C. Alternative Sentencing

Tennessee Code Annotated section 40-35-102(6) provides that especially mitigated and standard offenders convicted of Class C, D, and E felonies are favorable candidates for alternative sentencing. A defendant is eligible for probation if the sentence imposed is ten

years or less. *Id.* at 40-35-303(a). In this case, the trial court determined that the defendant was a Range I, standard offender and sentenced him to four years and nine months for the Class C felony. The defendant, therefore, was eligible for probation.

The sentencing act provides several factors for trial courts to consider when determining whether to suspend a defendant's sentence. Tennessee Code Annotated section 40-35-103 provides that courts should consider the following when imposing sentences involving confinement:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Tenn. Code Ann. § 40-35-103(1). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative." *Id.* § 40-35-103(5). The defendant bears the burden of demonstrating that he is suitable for probation. *Id.* § 40-35-303(b).

In our review of the record, we conclude that the defendant has not overcome the presumption of correctness afforded the trial court's determinations. The record supports the court's finding that incarceration was necessary to avoid depreciating the seriousness of the offense, that the defendant had a lack of remorse based on his threats after the verdict, and that the defendant was not amenable to rehabilitation because of his diagnosis as having antisocial personality disorder and his noncompliance with treatment at Centerstone.

### Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE

-13-